United States Bankruptcy Court
Southern District of Texas

**ENTERED**
December 08, 2025
Nathan Ochsner, Clerk

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 22-90273 |
| MINING PROJECT WIND | § | |
| DOWN HOLDINGS INC., *et al.*, | § | CHAPTER 11 |
| | § | |
| Debtors. | § | |
| | § | |
| TRIBOLET ADVISORS LLC, | § | |
| AS PLAN ADMINISTRATOR | § | |
| AND TRUSTEE FOR THE | § | |
| MINING PROJECT WIND | § | |
| DOWN HOLDINGS, INC. | § | |
| LITIGATION TRUST, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 24-3144 |
| | § | |
| RELM INSURANCE LTD., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

Tribolet Advisors LLC, in its capacity as Plan Administrator and Litigation Trustee of the Mining Project Wind Down Holdings, Inc. Litigation Trust, seeks an order compelling Relm Insurance Ltd. to fund a $4.65 million within-limits settlement demand under Relm's post-petition directors' and officers' liability insurance policy.

The Court conducted an evidentiary hearing over four days and heard closing arguments. These are the Court's Findings of Fact and Conclusions of Law.

Tribolet's $4.65 million settlement demand was reasonable. Relm's refusal to consent to the within-limits demand was wrongful. Because the specific remedy sought by Tribolet exceeds the scope of available remedies under the law, Tribolet's motion is denied.

## BACKGROUND

Compute North Holdings, Inc. was incorporated in Delaware and maintained its principal place of business in Minnesota. Case No. 22-90273, ECF No. 1. Prior to bankruptcy, Compute North mined Bitcoin and expanded into operating crypto mining data center facilities. As part of that business, Compute North acquired modular crypto mining containers containing electronic infrastructure.

Compute North and its affiliates filed chapter 11 petitions on September 22, 2022. At the time of the filing, Compute North's remaining assets were 92 crypto-mining containers. ECF No. 114-16 at 3. Thirty containers were subsequently sold prior to the Plan's Effective Date. ECF No. 114-16 at 4.

It is undisputed that, in November 2022, BitNile sued David Perrill, an insured D&O Defendant, along with other directors and officers not in this adversary, for fraud, fraudulent concealment, and civil conspiracy. ECF No. 1 at 7.

Compute North's Plan was confirmed on February 16, 2023. Case No. 22-90273, ECF No. 1019. The Mining Project Wind Down Litigation Trust was established on the Effective Date and Tribolet Advisors LLC was appointed as Plan Administrator and Trustee. ECF No. 114-18 at 25.

Around April 2023, Tribolet began marketing the remaining 62 containers for sale. ECF No. 114-16 at 4. During the sale process, Tribolet visited the yards where the containers were held and learned that the containers were damaged beyond normal wear and tear. ECF No. 114-16 at 4.

In July 2024, Tribolet commenced this adversary proceeding to freeze the distribution of insurance proceeds from the D&O policies to the Defendants in the BitNile suit until Tribolet resolved the Estate's D&O claims. ECF No. 1. Compute North maintained three management liability insurance policies: (1) Relm's pre-petition D&O policy with a policy limit of $2.5 million, (2) Banyan's pre-petition D&O policy with a policy limit of $2.5 million, and (3) Relm's post-petition D&O policy with a policy limit of $5 million ("Policy at Issue"). ECF Nos. 114-1, 114-2, 114-3.

In December 2024, Tribolet commenced *Tribolet Advisors LLC v. Perrill*, Adv. Pro. No. 24-30278 ("D&O Adversary"), to recover damages from Compute North's directors and officers[1] for alleged wrongful acts occurred before and after the Petition Date. The wrongful acts center around the Defendants' failure to physically maintain 62 containers stored in Granbury, Texas and Greenville, North Carolina ("Container Claims"). Case No. 24-03278, ECF No. 1.

In March 2025, Tribolet made an oral settlement demand of $5.5 million to resolve the Estate's D&O claims. ECF No. 138 at 60. Relm did not communicate that demand to the D&O Defendants. ECF No. 151 at 57.

On April 4, 2025, Tribolet supplied Relm information regarding the Container Claims. ECF No. 114-25 at 2. Five days later, Relm replied, requesting additional information from Tribolet. ECF No. 114-25 at 1. On April 28, 2025, Tribolet responded to the questions. ECF No. 114-26. Relm did not inform Tribolet on whether his responses were adequate. ECF No. 138 at 65. On the same day, Tribolet made a settlement demand to the Defendants to settle his claims in the D&O Adversary. ECF No. 114-26.

---

[1] The named defendants are David Perrill, Peter J. Lee, Tad Piper, Marshall Johnson, Spencer Barron, Tom Kieffer, Kristyan Mjolsnes, Eli Scher, and Jose Lima.

In May 2025, Relm called Paul Lackey, counsel for eight of nine D&O Defendants[2] to discuss the Container Claims and the demand. ECF No. 116 at 3. Lackey told Relm that he had little knowledge of the Container Claims. ECF No. 116 at 3.

On June 4, 2025, Tribolet made his first within limits settlement demand of $2 million under the pre-petition policies to settle his pre-petition claims and $5 million under the Policy at Issue. ECF No. 114-4. On the same day, Relm sent Tribolet additional follow-up questions. ECF No. 138 at 66. Tribolet responded two days later. ECF No. 138 at 66. Relm did not inform Tribolet on whether his responses to the questions were adequate. ECF No. 138 at 66. Some time after Tribolet responded to Relm's questions, Relm rejected the first within limits settlement demand. ECF No. 138 at 66.

On July 21, 2025, Tribolet made his second settlement demand of $4.65 million under the Policy at Issue to settle his claims against the Defendants in the D&O adversary. ECF No. 114-5. The proposed settlement would resolve and release Tribolet's claims asserted in the D&O Adversary along with his claims asserted in the related adversary proceedings. ECF No. 114-5. On July 24, 2025, Lackey asked Relm to accept the demand and invited Relm to ask for additional information needed to evaluate the offer. ECF No. 152-2 at 3. Relm did not send Tribolet any additional questions that it needed to be answered. ECF No. 138 at 70. A week later, Relm declined to accept the $4.65 million demand. ECF No. 114-27 at 1.

On July 31, 2025, Tribolet filed his emergency motion to determine that its $4.65 settlement demand under the Policy at Issue is reasonable and that Relm unreasonably withheld consent. ECF No. 79.

On August 5, 2025, the Court held a hearing on the motion. ECF No. 97. At the hearing, David Perrill withdrew his objection to the motion and consented to Tribolet's settlement demand. ECF No. 164 at 2, 3.

---

[2] Lackey's clients are Spencer Barron, Tom Kieffer, Peter Lee, Kristyan Mjolsnes, Tad Piper, Marshall Johnson, Eli Scher, and Jose Lima.

The Court held evidentiary hearings on September 8, 9, 16, and 19, 2025. On October 10, 2025, the parties submitted closing briefs and the Court heard closing arguments. ECF No. 172.

## JURISDICTION

The District Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(b). Venue is proper in this District pursuant to 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2). The dispute has been referred to the Bankruptcy Court under General Order 2012-6.

## DISCUSSION

Under the Policy at Issue, the D&O Defendants cannot settle any claim without Relm's prior written consent, *which shall not be unreasonably withheld*. ECF No. 110-3. The Policy is silent with respect to which state's law governs the insurance contract.

When the contract is silent on the applicable choice of law, federal courts in Texas must apply Texas' choice of law principles. But "if the laws of the states do not conflict, then no choice-of-law analysis is necessary" and the law of the forum state simply applies. *Mumblow v. Monroe Broad., Inc.*, 401 F.3d 616, 620 (5th Cir. 2005); *W.R. Grace & Co. v. Cont'l Cas. Co.*, 896 F.2d 865, 874 (5th Cir. 1990). Tribolet argues that either Delaware (Compute North's state of incorporation), Minnesota (Compute's North principal place of business), and Texas law apply to this contract. Relm des not challenge that assertion.

The laws of Delaware, Minnesota, and Texas are materially similar with respect to: (1) whether Relm unreasonably withheld consent to Tribolet's settlement demand, and (2) if so, whether Relm can be compelled to accept the settlement demand. Delaware, Minnesota, and Texas each recognize that an insurer's unreasonable refusal to consent to settlement can expose the insurer to liability for the insured's excess loss after a judgment or settlement is entered. Because no conflict exists, the Court applies Texas law.

I.  **REASONABLENESS OF SETTLEMENT**

The first issue is whether Tribolet's within limits settlement demand of $4.65 million is reasonable. The Court heard testimony from Michael Tribolet, Eric Roberts, Paul Lackey, and Colin Bernardino. The witnesses testified truthfully and appeared credible.

The Court finds that Tribolot's settlement demand of $4.65 million is reasonable, and Relm's refusal is inconsistent with its settlement obligations under its policy.

### *A.     The Scope of Coverage*

As an initial matter, the parties dispute whether the Policy at Issue covers both pre-petition and post-petition wrongful acts committed by the D&O Defendants. Relm's primary defense in its refusal to settle is that most of the wrongful acts occurred pre-petition and that Relm is not obligated under the Policy at Issue to provide coverage for the Defendants. Relm's position is wrong.

The scope of coverage under the insurance contract is governed by the "eight corners rule." Under the "eight corners rule" the liability insurer is required to determine its duty to defend solely from the terms of the policy and the pleadings of the third-party claimant, without regard to the truth or falsity of those allegations. *GuideOne Elite Ins. Co. v. Fielder Road Baptist Church*, 197 S.W.3d 305 (Tex. 2006). The Court initially only looks at the two documents: the four corners of the Policy at Issue, and the four corners of the third-party claimant's pleadings. *See id.* at 308. Absent ambiguity, evidence outside those documents is not material to the determination to the scope of coverage and "allegations against the insured are liberally construed in favor of coverage." *Id.* The language of these eight corners is plain and unambiguous. Relm's attempt to introduce parol evidence of the parties' intent under the Policy is irrelevant to the scope of coverage analysis.

The four corners of the Policy plainly provide coverage. Side A of the Policy provides:

> The Insurer shall pay on behalf of the **Insured Persons** all **Loss** for which the **Insured Persons** are not indemnified by the **Company** and which the **Insured Persons** become legally obligated to pay on account of any **Claim** first made against them during the **Policy Period** or the **Extended Reporting Period**, if exercised for a **Wrongful Act**.

ECF No. 114-3 at 17. The Policy Period is from September 22, 2022 to September 22, 2023. ECF No. 114-3 at 1. An amendment to the Policy at Issue provides:

> In accordance with the terms of the Policy it is agreed that coverage granted by this policy, and in accordance with the terms thereof, is extended in respect of any **Claim(s)** that may be made against the Insured until September 22, 2029 at 12:01 local time, but only with respect to any **wrongful acts** committed or alleged to have been committed on or before September 22, 2023 at 12:01 local time.

ECF No. 114-3 at 30. Coverage under the Policy is extended to claims against the insureds with respect to wrongful acts that were committed before September 22, 2023.

The four corners of the D&O Adversary Complaint only allege wrongful acts that occurred before September 22, 2023. Adv. Pro. No. 24-03278, ECF No. 1. The plain language of both documents is clear. The Policy at Issue provides coverage for all allegations of wrongful conduct in the Complaint. Relm is obligated to provide defense and indemnity coverage for pre-petition wrongful acts.

### B.  *Potential Liability*

The Court next considers the potential liability associated with the claims against the insured D&O Defendants. Under Texas law, the insured must "establish that from its standpoint the settlement was made in good faith and was reasonable and prudent under the circumstances." *See Kiewit*, 513 F.3d at 152 (quoting *Mitchell's, Inc. v. Friedman*, 157 Tex. 424, 431 (Tex. 1957)). The insured does not need to prove actual liability to recover from the insurer. *See Ins. Co. of N.A.*

*v. Aberdeen Ins. Servs.*, 253 F.3d 878, 888 (5th Cir. 2001). But "[a]n insurer also will not be obligated to indemnify its insured for a settlement that is collusive or unreasonable in amount." *In re Farmers Tex. Cnty. Mut. Ins. Co.*, 621 S.W.2d 261, 273 (Tex. 2021). The question is therefore not whether Tribolet can prove liability to an absolute certainty, but whether the $4.65 million settlement was a reasonable and prudent estimate of the insureds' potential exposure.

To quantify potential liability, Tribolet advances three approaches to calculate the value of the claims in the D&O Adversary. Tribolet testified at trial that all three approaches independently produce damages in the range of $4 million, exclusive of interest. ECF Nos. 138 at 49, 52, 53.

Under the first approach, the Trustee compared the Liquidation Trust's projected recovery with the actual recovery realized during the post-petition sale process. Tribolet's Liquidation Analysis assumes that 62 of unsold containers could have been sold in the range of $150,000 to $175,000 per container. ECF No. 138 at 52. Tribolet testified his actual recovery was $4.67 million pre-commission, resulting in a shortfall of $4.63 million under conservative assumptions. ECF No. 138 at 52, 53.

Relm challenges the projected container values, asserting that the actual sale prices, in the range of $80,000 to $115,000, reflect not the deterioration of the containers, but the market conditions of cryptocurrency and increased electricity costs associated with crypto-mining. ECF No. 126-1. Tribolet testified that many, but not all 62 containers were damaged. ECF No. 138 at 78. Under direct examination, Tribolet was unable to trace the sale of the certain damaged containers to their respective buyers. ECF No. 140 at 11. Relm further elicited testimony showing that the containers were worth less than Tribolet's projected sale prices for reasons unrelated to the conditions of the containers. Eric Roberts, Relm's VP of claims, testified that Relm relied on market conditions of the containers when considering Tribolet's settlement demand:

> The container claims – – so the containers would be worth, you know, far less since Bitcoin is worth far less. Those, you know, go kind of hand-in hand with valuations. And then you take into consideration that the cost to run the mining equipment within the containers is doubled in price, which makes it less valuable as well.

ECF No. 140 at 82.

The second approach relies on repair-cost estimates prepared by RK Mission Critical,[3] which estimated a cost of $66,000 per container to restore the 62 damaged units to full warranty condition. ECF No. 79-13. The estimate included rewrapping, transportation to a repair facility, replacement of electrical hoods, rework, and retesting. ECF No. 79-13 at 2. The aggregate total of repairing the 62 damaged units amounts to around $4 million. The figure is overstated to a degree because, as Tribolet conceded, not all containers were damaged.

The third method compares the cost of purchasing new containers with the actual recovery realized from the sale of the deteriorated containers. Tribolet testified that this method also produced damages exceeding $4 million before interest. ECF No. 138 at 116.

Relm proposed an alternative figure of $1.485 million based on percentage reductions applied to RK Mission Critical's estimate. ECF No. 163 at 6. These reductions were not supported by testimony, documents, or expert opinion. The Court assigns them little weight.

In addition to principal damages, the Court must consider pre and post judgment interest, both of which are covered "Loss" under the DIP policy.[4] ECF No. 79 at 21. Considering the amount of potential damages

---

[3] RK Mission Critical is the original vendor for the containers. ECF No. 138 at 42.

[4] **Loss** means the total amount the **Insureds** become legally obligated to pay on account of a Claim made against them, including, but not limited to, damages (including punitive, exemplary, or multiple damages), judgments, any award of pre-judgment and post-judgment interest with respect to covered damages, settlements, and **Claim Expenses**. ECF No. 162 at 10.

and the accrued time since the alleged wrongful acts occurred, interest would add a meaningful component to the insureds' potential exposure. Relm offered no evidence to suggest otherwise. Tribolet estimates the interest on a $4 million damages figure would yield about $1 million, which would fall under the Policy coverage. ECF No. 138 at 50.

In its post-trial brief, Relm argues that Tribolet failed to consider viable defenses to liability in making its settlement demand. ECF No. 163 at 10. Relm alleges that Compute North's certificate of incorporation exculpates the company's directors from all duty of care liability and that the Confirmed Plan provides releases to certain directors and officers. Tribolet contends that the incorporation documents do not relinquish an estate's fiduciary's duties imposed by federal bankruptcy law. ECF No. 162 at 12. Tribolet also argues that the Plan does not release the directors and officers from claims arising out of gross negligence or willful misconduct. ECF No. 162 at 11. The defenses may or may not succeed.

Regardless of the potential merits of these defenses against liability, Tribolet is not required "to aggressively pursue every available defense to a lawsuit prior to settlement in order for that settlement to be deemed reasonable." *XL Specialty Ins. Co. v. Kiewit Offshore Servs., Ltd.*, 426 F.Supp. 2d 565, 577 (S.D. Tex. 2006), *aff'd*, 513 F.3d 146 (5th Cir. 2008). Imposing such standard would be the "functional equivalent" of requiring Tribolet to prove its actual liability. *Id.* Reasonableness is assessed based on realistic potential liability, not liability already determined.

In considering potential liability, the Court notes that calculation of damages is inherently imprecise. The parties are acting with incomplete information. But evaluating reasonableness does not demand a mini-trial to reach the exact figure in damages. While the three approaches provide varying levels of certainty, consideration of the defense costs is determinative. The defense costs are significant.

The cost of further litigation is a significant factor in assessing the reasonableness of the Trustee's settlement demand. *See, eg., Travelers Indem. Co. v. Citgo Petroleum Corp.*, 166 F.3d 761, 767 n.6 (5th Cir. 1999) ("The public interest in abetting settlement is solely concerned with the saving of litigation costs that it produces."). The Policy at Issue provides coverage for "reasonable fees (including attorneys' fees and experts' fees) and expenses incurred by the **Insureds** . . . (i) in the investigation, defense or appeal of a Claim . . . or (ii) at the Insurer's request to assist the Insurer in investigating a **Claim**." ECF No. 114-3 at 3.

The record here overwhelming establishes that continued litigation would consume a substantial portion, if not all, of the Policy's remaining funds. It is undisputed that $1.9 million was paid under Relm's pre-petition policy, leaving about $600,000 under the pre-petition policy and the full $2.5 million limit under Banyan's excess liability policy. ECF No. 173 at 8. Tribolet estimates that $4.4 million in defense costs, relating to the D&O Adversary and the BitNile state action, have accrued but are not yet paid under the pre-petition policies. ECF No. 79 at 13 (relying on the Insurers' figures).

Based on the Insurers' figures, about $1.4 million in accrued defense costs would bleed into the Policy at Issue here, leaving about $3.6 million of coverage for both ongoing defense costs and indemnity.

Exhaustion of the remaining coverage is a likely event. Lackey testified:

> [W]hen you have nine defendants, you have complex factual claims by an entity that's had control of the facts for a year and a half, and you have this – – the size of these claims given the history of how much was spent in BitNile, which I thought were probably worse claims than these claims, or what was spent to get to where we are in these claims where there's been no substantive discovery, **it's pretty obvious to me that there is a highly significant risk that the amount of the insurance policy will be spent prior to reaching a settlement.**

ECF No. 156 at 20 (emphasis added). He further testified that defense costs will be in the "millions of dollars" if this case proceeded to trial. ECF No. 156 at 23. Defense counsel for David Perrill, Colin Bernardino, offered similar testimony. Bernardino testified:

> Just based on my experience to date in this case, and in prior other litigation, it, you know as of now, you know, just my firm has incurred, I think, on the D&O action alone, in excess of $1.3 million through August. And then, additionally, in BitNile, I think something approaching $2 million, again, through August. And, you know, I know that there are other defendants as well. And so between discovery and the trial motions, there's the motions to dismiss that are pending. We also filed a motion to withdraw a reference that would have to be litigated. And then, you know, summary judgment, presumably, as well, as trial, you know, the cost of all of those things, would, **I would expect, when considering that there are nine defendants, would easily exceed $5 million**.

ECF No. 156 at 31–32 (emphasis added).

Eric Roberts, Relm's Vice President of Claims, offered a starkly lower estimate. Roberts testified that it would cost between $250,000 to $500,000 of defense costs between a 30 to 60 day window to evaluate the Container Claims and determine a reasonable settlement value. ECF No. 151 at 14. But Roberts's estimate does not account for costs related to further litigation, discovery, and trial if the case does not settle before trial.

Roberts testified at deposition that Relm typically relies on defense counsel's budget and projections for what their defense costs would be during discovery. ECF No. 151 at 38. But Relm did not ask defense counsel for a budget of defense costs for this case. ECF No. 151 at 38–39.

Roberts was also operating on the assumption that the Policy at Issue does not cover pre-petition wrongful acts. As discussed *supra* p.

5–7, nothing in the DIP policy excludes coverage for pre-petition wrongful acts. Roberts agreed that if the Policy at Issue covered pre-petition wrongful acts, which it does, defense costs would exhaust the policy.

> **JORDANO**: If this post-petition policy is found to cover prepetition wrongful acts, you agree that the defense cost to defend the prepetition misconduct absent settlement would exhaust the policy, right?
>
> **ROBERTS**: It'd exhaust the runoff policy, the policy from the $5 million limit that we have. That's what you're talking about?
>
> **JORDANO**: Correct.
>
> **ROBERTS**: Yeah, I think based off of all the – – the defense costs we've received on the prepetition, I think, yes, there's – – *it would most likely exhaust the $5 million DIP policy*.

ECF No. 151 at 46–47 (emphasis added).

The D&O Defendants' counsels were in the best position to assess the scope of discovery and necessary expenditures for this complex issue. Their testimony was detailed, grounded in their experience representing directors and officers, and consistent with the complex issues of these claims. The record shows that Relm did not ask defense counsel for their defense budgets. The record also does not support Relm's contention that this case can easily be settled by incurring $250,000 to $500,000 in defense costs.

A prudent insurer must consider the foreseeable cost of defense into its evaluation of a within-limits settlement demand. Relm did not do so.

The preponderance of the evidence shows that the likely liability, inclusive of defense costs, will deplete the limit under the Policy at Issue. The Court finds the settlement demand of $4.65 million reasonable.

## II.   OBLIGATION UNDER *XL SPECIALTY* AND *STOWERS*

The second issue is whether the Court has authority to compel Relm to accept this reasonable settlement demand. It does not. Under Texas law, the insurer's refusal to settle a reasonable demand gives rise only to post judgment or post settlement monetary relief, not prospective specific performance.

Tribolet relies on *XL Specialty Ins. Co. v. Kiewit Offshore Servs. Ltd.*, 513 F.3d 146, 152 (5th Cir. 2008) to support its requested relief. His reliance is misplaced. In *XL Specialty*, the Fifth Circuit held that an insured who settles a claim with a plaintiff after its insurer wrongfully refuses to consent may recover the amount of the settlement from the insurer. *Id.* at 152. The facts in the case are instructive. Kiewit operated a welding facility in Ingleside Texas. *Id.* at 148. An explosion at the facility killed two employees. *Id.* Kiewit investigated its potential liability and estimated it in the tens of millions. *Id.* Kiewit sought coverage under its subcontractor's excess liability policy with XL Specialty, which refused to defend and indemnify any settlement. *Id.* Kiewit settled the wrongful death claim with the third-party claimant for $4 million, consistent with the subcontractor's own settlement of a related claim. *Id.* at 149. Only after Kiewit entered into that settlement did it seek reimbursement from the insurer. *Id.* The Fifth Circuit affirmed that Kiewit faced substantial potential liability, and that the settlement was reasonable, prudent, and in good faith. *Id.* at 153. XL Specialty was liable for the settlement amount.

The other applicable doctrine is *Stowers*. Under *Stowers*, an insurer that wrongfully rejects a reasonable, within-limits settlement demand will be liable for excess judgment that results, even if it is above the policy limits. *G.A. Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544 (Tex. App. 1929). The *Stowers* duty triggers when: (1)

the claim against the insured is within the scope of coverage, (2) the demand is within the policy limits, and (3) the terms of the demand are such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to the excess judgment. *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 849 (Tex. 1994). In *Stowers,* a jury returned a judgment above the policy limits after the insurer declined to settle within limits. *G.A. Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544 (Tex. App. 1929). After Stowers paid the excess judgment, it sued its insurer for negligently refusing to accept the settlement. *Id.* The Court found that the insurer was negligent in rejecting the demand because it was reasonable. *Id.* And the insurer was liable for the excess judgment.

Under both *XL Specialty* and *Stowers*, liability on the insurer applies retrospectively, either post settlement or post judgment. Here, neither has occurred. The Court cannot compel Relm, the non-consenting insurer, to accept a reasonable settlement demand. Accordingly, Tribolet's emergency motion to compel is denied. Relm will be exposed to limitless potential liability for both defense costs and indemnity if it fails to pay the settlement amount. That is a risk that it is free to take under applicable law.

## CONCLUSION

A separate order will be entered.

SIGNED 12/08/2025

Marvin Isgur
United States Bankruptcy Judge